MICHAEL MCCABE *vs.* ARTHUR E. SHIELDS & another.

Suffolk. January 9, 1900. — March 2, 1900.

Present: HOLMES, C. J., MORTON, LATHROP, BARKER, & HAMMOND, JJ.

*Personal Injuries — Master and Servant — Superintendence — Negligence —*
*Due Care — Law and Fact — Evidence.*

In this case, which was an action under the employers' liability act, St. 1887, c. 270, for personal injuries alleged to have been caused by the negligence of a person in the defendant's service intrusted with and exercising superintendence, the evidence warranted a finding that he was acting as superintendent with the authority and consent of the defendant when the latter was not present, in the directions which he gave to the plaintiff with reference to the work that he was doing at the time of the accident, and that placing a dangerous appliance in the plaintiff's hands with instructions to use it was an act of superintendence, and was negligent; and the questions whether the plaintiff was in the exercise of due care, and whether the accident happened as he contended that it did, were properly submitted to the jury.

In an action under the employers' liability act, St. 1887, c. 270, for personal injuries alleged to have been caused by the negligence of A., a person in the defendant's service intrusted with and exercising superintendence, evidence of a workman in the defendant's shop, as to acts of A. in putting people out of the shop and his language at the time he did it, is admissible as bearing upon A.'s conduct in the shop in matters of control.

TORT, under the employers' liability act, St. 1887, c. 270, against Patrick Shields and Arthur E. Shields, copartners under the firm name of the Shields Foundry Company, for personal injuries alleged to have been caused by "the negligence of the person in the service of the defendants intrusted with and exercising superintendence." Trial in the Superior Court, before

*Fessenden*, J., who allowed a bill of exceptions, in substance as follows.

The plaintiff testified that he had been a heavy machine moulder for about twenty-five years; that he entered the employ of the defendants, whose business was making repairs for stoves, on September 28, 1896, and worked there until the day of the accident, which was November 23, 1896; that when he applied to the defendants for work, Patrick Shields said that he would hire him and told him to go to James Hannon, that Hannon was foreman of the foundry and would set him to work; that the plaintiff reported to Hannon, who put him to work; that during the next two months he saw Hannon giving directions and instructing the men about their work; that when they were out of a job they went to Hannon for another one; that Hannon gave him instructions as to the work which he should do during all the time that he worked for the defendants; that Hannon discharged a man while he was there; and that he never saw the defendants or any person other than Hannon giving instructions. He further testified as follows: " On the day of the accident I was working beside Hannon, and had been making different jobs of stove repair. I went to Hannon and asked him what I should make, as I had run out of a job. He gave me this pattern (which was produced) and told me to make five of them. He said the flask I was using was not deep enough, but there were some on his floor that were deeper, but they were not deep enough; that they had no flasks on the premises that were deep enough to make the pattern in; and that when I got the first one made to call his attention and he would show me a remedy that would help to save it, as the flasks were not deep enough. Hannon furnished me with five flasks. After making the mould, I then called Hannon's attention to it, and told him I was ready for him to go and show me what he wanted me to do. He took a piece of iron over with him from his shelf. It was wet and rusty. I saw him take the piece of iron from his bench shelf and punch a hole in the top half of that mould. That piece of iron was between six and seven inches long and about three eighths of an inch thick, with a scale of rust on it. Hannon drove it through the top of the mould from the inside while it was standing on its edge. As he did it, he said I must

leave this punch back on his bench when I got through with it. He gave me directions regarding the other four. I went and got a weight and placed it on the second one I made. I called Hannon's attention and asked him if that weight would help save them. He said I should use the weight, and I must use the riser also, on the other four; that I must punch the riser in the other four as he showed me how to punch the first one, as well as using the weight. The weight would keep them from lifting up. He told me when I came to pour them I must watch the riser, and when I saw the iron coming up in that riser to pour slow. I put the weight on to keep the metal from forcing the sand up and spoiling the casting. If forced up, the casting would be too thick. I proceeded to make the other four in the same way and then began to fill them. I carried the molten metal in a hand ladle and let it set about two minutes to cool off. Then I poured it into the moulds through the sprue. Nothing happened until I was pouring the fifth mould. This was the one Hannon punched the riser in. It blew up, and the accident happened. The riser and sprue were about two or two and a half inches apart, and while filling the fifth mould I wanted to watch the iron coming up in the riser, and it exploded; sounded like the report of a gun, and shot me in the eye. I had poured about three fourths or more of the metal that it would take to fill the mould. My eye was about three feet from the top of the flask and I did not see the metal in the riser before it flew. I was in a stooping position, watching for the iron to come up in the riser so I would pour my metal slow."

On cross-examination the plaintiff testified as follows: " When iron is ready to be poured it can be poured in a stream from the ladle about the same as warm molasses. A riser is merely a hole which runs from the inside of the mould to its surface. It is necessary to use more or less water in making moulds. The top section of the flask is known as the 'cope,' the section next below as the 'nowel' and the part below is the bottom. I have seen iron weights used on moulds, and used one the day of the accident. The object of putting a riser on a mould is, so far as I know, in machinery moulding, to take the strain off the pattern and to show when the iron comes up; that is, so as not to make the casting too thick by pouring in too much iron. One

can see when the iron comes up in the riser and so stop pouring. I saw Hannon around the shop, turning iron from the ladles into the moulds almost every day while I worked there. I saw him make some moulds. I never saw him make the whole of a mould, but have seen him make part. It was his custom each day to fill the moulds he made from his own ladle. I have seen him work every day with his own hands. During two or three weeks when I worked near him I saw him around instructing people, allotting out the work and doing anything to be done by the foreman."

Peter F. Cleary, called as a witness by the plaintiff, testified as follows: " I worked for the defendants for fourteen months next prior to the accident. Fourteen men worked there. I have seen Hannon instructing men and giving out work. He told me what to make. He had charge of the shop. I went to him at different times to get what work I wanted. He kept the time of the men. I saw Hannon put people out of the shop several times." The witness was then asked the following question : " Will you tell us what that was, or what you saw him do ? " To which he answered as follows : " I have seen him come in there, and he would walk up to them and tell them there was nobody allowed in there ; that his orders were to put every man that came in, out." This answer was objected to, · but was admitted, and the defendants excepted.

The witness further testified as follows : " I have seen Hannon bring tools to the men to work with. I have seen both Shields' exercising authority in the factory, but no one beside the Shields' and Hannon. I do not see how it was possible to keep tools in that factory without having them rust. Patrick Shields said to a man working on the bench next to me, whom I was showing, ' If you want any instructions, you want to go to the foreman, Mr. Hannon, and he will instruct you.' "

On cross-examination, the witness testified as follows : " Risers are not required on castings of this nature. I have worked as a moulder twenty-seven years without risers. I have seen Hannon a great deal at the defendants', have seen him making moulds. He made moulds and poured iron on the day of the accident. He worked with his hands while he was doing other work. I consider all the labor he did as manual labor. He went around

the shop and spoke about everything wrong that he saw. He turned his own iron and made his own moulds. Sometimes he would make nearly as many moulds as the rest of the men."

The plaintiff called experts, who testified that the presence of rust in the riser or on the top of the surface of the space in the mould around the riser would be adequate to cause the accident, if the molten iron came in contact with it; that the quantity of rust which would adhere to the sand in the mould in perforating it with such an instrument as Hannon used would be sufficient in quantity, if brought in contact with the molten metal, to cause such an explosion as occurred; and that the accident could be ascribed to no other cause, under the circumstances stated in the plaintiff's evidence. This evidence further tended to show that there was no occasion to put a riser in such a mould; that there was no danger in making the mould; and that it was a perfectly harmless process.

Alexander Patterson, an expert witness called by the plaintiff, testified: " Risers are usually cut with a hollow brass tube when placed on top of the castings. Brass does not accumulate rust; that is the reason for using it. An iron punch is a proper thing with which to perforate a flask for the sake of making a riser. It can be used with safety, if clean."

Wilbert S. Maxwell, another expert witness called by the plaintiff, testified as follows : " *Q.* Assuming that the thing occurred as the plaintiff said it did, I mean under the conditions so far as the mould and the metal and the pattern are concerned, that there was an explosion, that is to say, there was a sound like the shot of a gun and metal flew quicker than it could be seen or its flight appreciated, and struck him in the eye at a distance of three feet or something like that, what would you say as to the cause? *A.* I could not think of anything but rust. I know of nothing else that would cause it. The iron coming in contact with a piece of rust would certainly explode the metal. A little rust might cause it. The iron will not lie against the rust. An iron punch is not a proper thing to make a riser; either a brass or a copper tube should be used; that is to avoid the danger that the presence of rust would create."

Patrick Shields, one of the defendants, testified that he hired the plaintiff, who represented himself to be a first-class moulder;

that he did not prove to be such a workman, and the witness discharged him, but his son, the other defendant, retained him in their employ; that a moulder could not escape seeing the molten iron in the mould through the riser after it was past the riser, provided he was looking at what he was pouring; that the proper way to stand when filling a mould, to obviate all danger of iron flying, is to rest the ladle handle over one's knee and hold the head away; that it is improper and dangerous to stand bent over the mould and one's head within three feet of the sprue; that Hannon did not have much to do with many of the men in the foundry; that he never hired or discharged, and no one but the defendants had that authority; that Hannon filled his own moulds and lugged his own flasks in the same way as any other man in the foundry did; that there was no difference in the way in which Hannon did his work from that of any other man, with the exception that the men had to go to him to pick out their patterns; that a riser placed in a mould decreases the danger of the mould blowing up or kicking, because it gives extraordinary vent; that it was impossible for the iron to have blown out of the riser owing to rust inside of the riser, if the mould was but three quarters full, because the iron had not got to the surface; that the plaintiff either hit the weight on the mould or some damp iron to cause the explosion; and that it was within the discretion of the moulders in the foundry as to using risers.

On cross-examination, the witness testified as follows: " I did not confer with Hannon about hiring the plaintiff and did not tell him to report to Hannon. Hannon had authority in the absence of myself and son in a certain way, that is, to carry patterns to the men or give them the patterns when they were out of work, when they came to him for them. There was a good deal of time when I was not at the foundry, but not much when my son was away. He was in the foundry and shipping-room during working hours. My son determined how much work was to be done in the foundry, and it was not communicated to Hannon."

Arthur E. Shields, the other defendant, corroborated, in substance, the testimony of Patrick Shields.

On cross-examination, he testified, among other things, as fol-

lows : " It was the duty of the men, in the absence of my father and myself, to report to Hannon if any of the appliances were not in proper condition. Provision was made that Hannon had charge in the absence of myself and my father."

James Hannon testified as follows: " At the time of the accident my daily occupation was moulding, principally. Sometimes I passed the patterns around to the help, but did nothing more in the way of giving orders. . . . Arthur Shields or his father gave the orders in the foundry about the general character of the work. I was in the foundry when the accident happened. The iron used to punch the riser in the mould in question was not wet and rusty. The iron was a round iron, a draw nail, we called it. I gave the plaintiff his pattern and told him the number to make of it, but nothing more. I heard a report at the time of the accident like a cap going off. I cleaned up the iron on the ground after the accident and there found scraps scattered all over the place for a space of ten or twelve feet. In my opinion, there were eight or ten pounds of iron there. I went over to the plaintiff's floor after the accident and noticed the mould he was filling at the time of the accident; noticed there was a weight upon it, like the one exhibited in court. I dumped the mould, that is, shook out the sand, and threw it over, flask and all. I found part of the casting in the mould. It appeared as if it was poured short; was not filled up. This casting had nothing about it to indicate that there had been an explosion from the inside of the flask. I know the plaintiff's general custom with reference to the use of water in constructing the mould. His custom was to wet it thoroughly all around before he used it. I have warned him against using too much water on his moulds. If the iron, when turned by the moulder from the ladle, strikes a weight which is damp, the weight being on the mould, the iron will fly every way. That has occurred to me when I have been turning. It is something entirely in the control of the moulder. There is no explosion if he turns the iron into the sprue without hitting the weight. The moulder can see the glow of the molten iron through the riser when it fills the mould. It is a common occurrence in foundries for iron to fly from one cause or another while moulds are being filled. If molten iron is turned upon a hard substance, such as the floor

of a foundry which has been tramped down and is wet, it will fly. From my experience as a moulder and my observation of the casting which was in the mould, or that part of it which was run, I should say the accident happened from the outside of the mould."

On cross-examination, the witness testified as follows: " The molten iron must come in contact with the upper part or roof of the space in the mould before it could come up through the riser. There was a system or method in the way of distributing the work. As a rule, I received my instructions from Arthur Shields and transmitted them to the men. When Patrick and Arthur Shields were absent and did not give authority themselves, the authority, discretion, and judgment were exercised by me. I gave the plaintiff that pattern. There was nothing unusual or extraordinary about this work. I gave him instructions as he asked for them, as he said that I knew more about that kind of work than he did. Weights were provided and used in the foundry. If a weight was required they used it. Risers are used more or less in our foundry, but I do not consider it necessary to use one on that mould. I told him to use one because it acted as a preventive. He could see the iron in the riser quicker; it would save straining the mould. I punched the riser with a draw nail, a piece of iron, something three eighths of an inch thick and five or six inches long. I use iron in perforating holes in moulds, and it never occurred to me that it was dangerous."

Several witnesses, who were employed by the defendants at the time of the accident, testified that Hannon worked the same as the other moulders, and did not exercise any authority over the men except to give them patterns.

The defendants offered evidence of experts tending to show that the iron rust which might have been retained in the bottom of the riser, or upon the top surface of the cavity in the mould, as a consequence of Hannon's punching the riser with the rusty, wet iron rod, could not have caused any of the molten iron to issue from the mould ; that the weight was a necessary, proper, customary, and indispensable article for use upon the mould ; that in their opinion the only way the accident could have happened was by the turning of a stream of molten iron from the

plaintiff's ladle upon the surface of the iron weight, or upon the top of the mould, which was wet and hard, thus causing the molten iron to fly up in his face; and that the riser enables the moulder to see the molten iron in the mould when it is being filled, and decreases the danger to the moulder when he is filling it.

The defendants requested the judge to rule that on all the evidence the plaintiff was not entitled to recover. This request was refused; and the defendants excepted.

The jury returned a verdict for the plaintiff; and the defendants alleged exceptions.

*G. W. Buck*, for the defendants.

*J. W. Corcoran*, (*W. B. Sullivan* with him,) for the plaintiff.

HAMMOND, J. The accident occurred since the passage of St. 1894, c. 499. There being no question of variance raised in the case, it was sufficient, on the question of superintendence, for the plaintiff to show that Hannon, when neither defendant was present, was acting as superintendent with the authority and consent of the defendants; and we think the evidence sufficient to warrant a verdict for the plaintiff that he was thus acting, in the directions which he gave to the plaintiff, with reference to the work which the plaintiff was doing at the time of the accident. There was evidence tending to show that the presence of rust in the riser, or on the surface of the space in the mould around the riser, would be adequate to cause the accident if the molten iron came in contact with it, and further, that the quantity of rust which would adhere to the sand in the mould, in perforating it with such an instrument as Hannon used, would be sufficient in quantity, if brought in contact with the molten metal, to cause such an explosion as occurred, and some experts testified that the accident could be ascribed to no other cause under the circumstances stated in the plaintiff's evidence. The jury might properly find that Hannon perforated the mould with a rusty instrument and that rust from it adhered to the riser, causing, in connection with the molten metal, the accident.

Without deciding whether the act of perforation was of itself one of superintendence, we think that when Hannon placed this mould thus perforated into the hands of the plaintiff and directed him to use it, he was acting as superintendent, and that the jury

might properly find that it was negligent in him, as such super-intendent, to place this dangerous mould in the hands of the plaintiff. *Malcolm* v. *Fuller*, 152 Mass. 160. *Dean* v. *Smith*, 169 Mass. 569. *O'Brien* v. *Look*, 171 Mass. 36, 41. *Riou* v. *Rockport Granite Co.* 171 Mass. 162, and cases there cited.

The questions whether the plaintiff was in the exercise of due care, and whether the accident happened as the plaintiff claimed it did, were properly submitted to the jury upon the evidence.

The answer of Cleary, as to the acts of Hannon in putting people out of the shop and his language at the time he did it, was admissible as bearing upon the conduct of Hannon in the shop in matters of control.

*Exceptions overruled.*